## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Gregory D. Squire, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.    I have been employed as a Special Agent of the Department of Homeland Security (DHS), Homeland Security Investigations (HSI) since 2007, and am currently assigned to the Boston Field office.  As part of my duties, I am authorized to investigate violations of the laws of the United States, including but not limited to criminal violations relating to the sexual exploitation of children, child pornography, coercion and enticement, and transportation of minors, including but not limited to violations of 18 U.S.C. §§ 2422, 2423, 2251, and 2252A.  For the past five years I have specialized in dark web investigations, with a focus on child sexual abuse and child pornography websites.  I am an active member of a multinational, multi-agency working group that coordinates national and international operations to combat child exploitation on the dark web and to rescue children from abusers who are active on the dark web.  As an agent in the Boston Field Office, I frequently participate in the execution of search warrants involving child exploitation and pornography, and I work closely with HSI forensic specialists throughout these investigations and prosecutions.

2.    I submit this affidavit in support of an application to search the premises located at 17 Heather Lane, Bridgewater, Massachusetts (the "SUBJECT PREMISES"), as more fully described in Attachment A, which is incorporated herein by reference; and to seize evidence, instrumentalities, fruits of crime, and contraband as more fully described in Attachment B, which is also incorporated herein by reference.

3.      The statements in this affidavit are based in part on information provided by federal agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents, including foreign law enforcement agencies; information gathered from the service of administrative subpoenas; the results of physical and electronic surveillance conducted by law enforcement agents; independent investigation and analysis by federal agents/analysts and computer forensic professionals; and my experience, training, and background as a Special Agent with HSI.

4.      Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) and (b)(1) (Attempted Receipt of Child Pornography) and 2252A(a)(5)(B) and (b)(2) (Access with Intent to View and Possession of Child Pornography, and attempt) are located at the SUBJECT PREMISES.

## BACKGROUND OF THE INVESTIGATION

### The Tor Network

5.      The Internet is a global network of computers and other devices. Devices directly connected to the Internet are uniquely identified by IP addresses,[1] which are used to route

---

[1] An "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most Internet Service Providers (ISPs) control a range of IP addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times

information between Internet-connected devices.  Generally, when one device requests information from a second device, the requesting device specifies its own IP address so that the responding device knows where to send its response.  On the Internet, data transferred between devices is split into discrete packets, each of which has two parts: a header with non-content routing and control information, such as the packet's source and destination IP addresses; and a payload, which generally contains user data or the content of a communication.

6.     **Website A,**[2] further described below, operates or operated on the Tor network, which is a computer network available to Internet users that is designed specifically to facilitate anonymous communication over the Internet.  The Tor network attempts to do this by routing Tor user communications through a globally distributed network of intermediary computers, or relays, along a randomly assigned path known as a "circuit." Because of the way the Tor network routes communications through the relay computers, traditional IP address-based identification techniques are not effective.

7.     To access the Tor network, a user must install Tor software.  That is most easily done by downloading the free "Tor browser" from the Tor Project, the private entity that maintains the Tor network, via their website at www.torproject.org.[3]  The Tor browser is a web browser that is configured to route a user's Internet traffic through the Tor network.

---

2   The name of **Website A** is known to law enforcement but redacted here because divulging its name would jeopardize law enforcement's ongoing investigation into users of **Website A** and other websites to which those individuals belong or on which they are active.

3   Tor users may also choose to manually configure a web browser or other application to route communications through the Tor network.  Use of the Tor network or the Tor browser is free and legal.  Based on my training and experience, however, I am aware that because of the anonymizing features offered by the technology, the Tor network has become a haven for web forums, chat sites, image galleries, and file hosts pertaining to the sexual exploitation of children.

8.      As with other Internet communications, a Tor user's communications are split into packets containing header information and a payload, and are routed using IP addresses.  In order for a Tor user's communications to be routed through the Tor network, a Tor user necessarily (and voluntarily) shares the user's IP address with Tor network relay computers, which are called "nodes."  The Tor user's routing information, which includes the user's destination and originating IP information, is stored in the header portion of the packet. As the packets travel through the Tor network, each node is able to see the address information of the previous node the communication came from and the next node the information should be sent to.  Those Tor nodes are operated by volunteers – individuals or entities who have donated computers or computing power to the Tor network in order for it to operate.

9.      Because a Tor user's communications are routed through multiple nodes before reaching their destination, when a Tor user accesses an Internet website, only the IP address of the last relay computer (the "exit node"), as opposed to the Tor user's actual IP address, appears on that website's IP address log.  In addition, the content of a Tor user's communications are encrypted while the communication passes through the Tor network. That can prevent the operator of a Tor node from observing the content (but not the routing information) of other Tor users' communications.

10.     The Tor Project maintains a publicly available frequently asked questions (FAQ) page, accessible from its website, with information about the Tor network.  Within those FAQ, the Tor Project advises Tor users that the first Tor relay to which a user connects can see the Tor user's actual IP address.  In addition, the FAQ also cautions Tor users that the use of the Tor network does not render a user's communications totally anonymous. For

example, in the Tor Project's FAQ, the question "So I'm totally anonymous if I use Tor?"
is asked, to which the response is, in bold text, "No."

11.  The Tor Network also makes it possible for users to operate websites, such as **Website A**,
called "hidden services" or "onion services," in a manner that attempts to conceal the true
IP address of the computer hosting the website.  Hidden service websites are accessible
only to users operating within the Tor network.  Like other websites, hidden services are
hosted on computer servers that communicate through IP addresses.  However, hidden
services have unique technical features that attempt to conceal the computer server's
location.

12.  Unlike standard Internet websites, a Tor-based web address is comprised of a series of at
least 16 and as many as 56 algorithm-generated characters, for example
"asdlk8fs9dflku7f," followed by the suffix ".onion."  Ordinarily, investigators can
determine the IP address of the computer server hosting a website (such as
www.justice.gov) by simply looking it up on a publicly available Domain Name System
("DNS") listing.  Unlike ordinary Internet websites, however, there is no publicly available
DNS listing through which one can query the IP address of a computer server that hosts a
Tor hidden service.  So, while law enforcement agents can often view and access hidden
services that are facilitating illegal activity, they cannot determine the IP address of a Tor
hidden service computer server via public lookups.  Additionally, as with all Tor
communications, communications between users' computers and a Tor hidden service
webserver are routed through a series of intermediary computers.  Accordingly, neither law
enforcement nor hidden-service users can use public lookups or ordinary investigative

means to determine the true IP address – and therefore the location – of a computer server that hosts a hidden service.

13.     Hidden service websites on the Tor Network are not "indexed" by search engines—such as Google—to anywhere near the same degree as websites that operate on the open Internet. Accordingly, it is much more difficult to perform a Google-type search of hidden service websites than it is to search open Internet websites for particular content of interest.  Users interested in accessing child exploitation material (or in advertising child exploitation and pornography websites they operate) therefore keep, maintain, and use directory sites that advertise the web addresses of hidden services that contain child exploitation related content.  Users utilize those directory sites to identify new web forums, chat sites, image galleries, and file hosts pertaining to the sexual exploitation of children.  While they operated, the web address for Website A was listed on one or more of such directory sites advertising hidden services dedicated to the sexual exploitation of children.

**Website A**

14.     ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████

15.     ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████

16. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████

17. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████

18. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████



19.

20.

a.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████

b.  ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

c.  ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████

21. 

a.



b. 

c.



**Nexus to the SUBJECT PREMISES**

22.



23. 

24.

25.

6

7



26.

27.

28.   Commercial databases indicate Paul BATEMAN (year of birth 1973) resides at the SUBJECT PREMISES with an adult female (year of birth 1980).   Property records held by the Town of Bridgewater indicate the SUBJECT PREMISES is a condominium residential dwelling owned by Paul BATEMAN.

29.     Records from the Massachusetts Registry of Motor Vehicle (RMV) show that Paul BATEMAN has an active Massachusetts Driver's License, which includes 17 Heather Lane, Bridgewater, MA as his residential and mailing address. The RMV records also indicate BATEMAN is the registered owner of a 2013 Nissan Altima Sedan with Massachusetts registration 3YTB90.  RMV records indicate the adult female resident of the address is listed as the registered owner of a 2015 Nissan Altima with Massachusetts registration 2WN776.

30.     On December 10, 2019, HSI Task Force Officer Randy DeMello conducted surveillance of the SUBJECT PREMISES.  From approximately 5:30 a.m. until 6:30 a.m., both vehicles described in paragraph 29 were observed parked in front of the SUBJECT PREMISES.

## CHARACTERISTICS COMMON TO CONSUMERS OF CHILD PORNOGRAPHY

31.     Based on my previous training and experience related to investigations involving child pornography and the sexual abuse of children, I have learned that individuals who create, possess, receive, distribute, or access with intent to view child pornography (collectively, "consumers" of child pornography) have a sexual interest in children and in images of children.  Based upon my knowledge, experience, and training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to such consumers of child pornography, as outlined in the following paragraphs.

32.     The majority of consumers of child pornography are persons who have a sexual attraction to children.  They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

33.     Consumers of child pornography may collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics, or digital or other images for their own sexual gratification.  These individuals often also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their deviant sexual fantasies involving children.  Non-pornographic, seemingly innocuous images of minors are often found on computers and digital storage devices that also contain child pornography, or that are used to communicate with others about sexual activity or interest in children.  Such images are useful in attempting to identify actual minors depicted in child pornography images found during the execution of a search warrant.  In certain cases, such images may also assist in determining the origins of a particular child pornography image or series of images.

34.     Many consumers of child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials.  They regularly maintain their collections in the privacy and security of their homes, cars, garages, sheds, or other secure storage location, such as on their person. Depending on their technical expertise, access to child pornography on seemingly "safe" networks like Tor, or struggle with addiction to child pornography, many consumers of child pornography delete their collection of child pornography, in an attempt to destroy evidence and evade law enforcement.

35.     Consumers of child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance, and support.  This contact helps

these individuals to rationalize and validate their deviant sexual interest and associated behavior. Furthermore, individuals who would have knowledge about how to access a hidden and embedded chat site would have gained knowledge of its location through online communication with others of similar interest. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, e-mail, bulletin boards, chat sites, web forums, instant messaging applications, and other similar vehicles of communication.

36.     Consumers of child pornography often collect, read, copy, or maintain names, screen names or nicknames, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange, or commercial profit. These names may be maintained in the original medium from which they were derived, in written hardcopy, on computer storage devices, or merely on scraps of paper.

37.     Based upon training and experience, I know that persons engaged in the production and possession of child erotica are also often involved in the production and possession of child pornography. Likewise, I know from training and experience that persons involved in the production and possession of child pornography are often involved in the production and possession of child erotica.

38.     Based on my training, knowledge, experience, and conversations with others in law enforcement, I understand that an individual who possesses images and/or videos depicting child pornography on one digital storage device and/or Internet email or online storage account is likely to possess child pornography on additional digital storage devices and/or

Internet email or online storage accounts that s/he possesses or controls.  Additionally, based on this training and experience, I understand that an individual who discusses the sexual abuse and/or exploitation of children on one digital storage device is likely to conduct those communications on additional digital storage devices that s/he possesses or controls.  Additionally, these digital storage devices may be small, and easily concealed on a person, or in a vehicle.

39.     I am aware that this investigation revealed that an individual located at the address listed in Attachment A accessed a website that is dedicated to the sexual exploitation of children, and which is accessed through the Tor network.  In my experience, this behavior is indicative of an individual with a sexual interest in children, and indicative of an individual who may be considered a "consumer" of child pornography.  In my experience, individuals who rely on access to materials depicting the sexual abuse of children through the Tor network tend to have sophisticated expertise with computers and they are typically individuals who are taking steps to hide their viewing of child exploitation materials.

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

40.     I have had training and experience in the investigation of computer-related crimes, including those involving child pornography.  Based on my training and experience, I know the following:

a.      Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other.  Computers basically serve four functions in connection with child pornography:  production, communication, distribution, and storage.

b.     Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. Electronic storage media of various types – to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer – can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

d.     The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

e.      Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Google, Yahoo!, and Hotmail, among others.  The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the Internet.  Evidence of such online storage of child pornography is often found on the user's computer.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

f.      As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

41.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found.  One form in which the records are likely to be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the

seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

42.     Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers.  Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, accessing the internet, and storing a range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

43.     I am aware of a report from the United States Census Bureau that shows that in 2016, among all households nationally, 89 percent had a computer, which includes smartphones, and 81 percent had a broadband Internet subscription.  Specifically, in 2016, when the use of smartphone ownership was measured separately for the first time, 76 percent of households had a smartphone and 58 percent of households had a tablet, and 77 percent of households had a desktop or laptop computer.  Further, according to the Pew Research Center, as of 2019, 96 percent of adult Americans own a cellphone, and 81 percent own a cellphone with significant computing capability (a "smartphone").  The percentage of adults that own a smartphone is even higher among younger demographic groups:  96 percent of 18-29 year olds, 92 percent of 30-49 year olds, and 79 percent of 50-64 year olds owned smartphones in 2019.

44.     I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there
        is probable cause to believe those records referenced above will be stored on that computer
        or storage medium, for at least the following reasons:

45.     Based on my knowledge, training, and experience, I know that computer files or remnants
        of such files can be recovered months or even years after they have been downloaded onto
        a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a
        storage medium can be stored for years at little or no cost.

46.     Even when files have been deleted, they can be recovered months or years later using
        forensic tools.  This is so because when a person "deletes" a file on a computer, the data
        contained in the file does not actually disappear; rather, that data remains on the storage
        medium until it is overwritten by new data.  Deleted files, or remnants of deleted files, may
        reside in free space or slack space—that is, in space on the storage medium that is not
        currently being used by an active file—for long periods of time before they are overwritten.
        In addition, a computer's operating system may also keep a record of deleted data in a
        "swap" or "recovery" file.

47.     Wholly apart from user-generated files, computer storage media—in particular, computers'
        internal hard drives—contain electronic evidence of how a computer has been used, what
        it has been used for, and who has used it.  This forensic evidence can take the form of
        operating system configurations, artifacts from operating system or application operation,
        file system data structures, and virtual memory "swap" or paging files.  It is technically
        possible to delete this information, but computer users typically do not erase or delete this
        evidence because special software is typically required for that task.

48.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  An internet browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

49.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

    a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.   Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, computers typically contain information that logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on

a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

50.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

51.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how

a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

52.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

53.   I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

54.   Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

a.     The volume of evidence — storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information.  Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names.  Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.     Technical requirements — analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files.  Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches.  Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

55.     The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene.   Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant.   If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

56.     The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B.  If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

57.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

58.     This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, HSI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CONCLUSION

59.     Based on the foregoing, I submit there is probable cause to believe that the federal criminal

statutes cited herein have been violated, and that the contraband, property, evidence, fruits

and instrumentalities of these offenses, more fully described in Attachment B of this

Affidavit, are located at the SUBJECT PREMISES, described in Attachment A.   I

respectfully request that this Court issue a search warrant for the SUBJECT PREMISES as

described in Attachment A, authorizing the seizure and search of the items described in

Attachment B.

_____

Gregory Squire
Special Agent
Homeland Security Investigations

Sworn and subscribed before me this 11th day of December, 2019.

HONORABLE DAVID H. HENNESSY
Chief United States Magistrate Judge

I have reviewed the images referenced in Paragraph 21 above and I find probable cause to believe
that they depict minors engaged in sexually explicit conduct.  The affiant shall preserve the images
provided to the Court for the duration of the pendency of this matter, including any relevant appeal
process.

HONORABLE DAVID H. HENNESSY
Chief United States Magistrate Judge